Ms. Stetson for the appellant, and Mr. Salzman for the appellate. Good morning, Your Honors, and may it please the Court, Kate Stetson for the appellant. This is a main-day investigation of a case in which a woman was found to be a victim of sexual assault,  and Mandamus is a rare thing. The District Court understood that, and so did we. As of December of last year, 2014, Judge Boasberg did not yet find that it was time for Mandamus to issue against the Secretary to compel her to abide by her statutory obligations. We are here in November of 2015 to suggest that it is time. There's no serious dispute that the Secretary has a nondiscretionary statutory duty to resolve administrative appeals within certain timelines. The issue, I think, is not so much one of whether Mandamus could issue in the end. I think the sharpest dispute between the parties, and really the point at which the District Court went off, was whether Mandamus should issue. Before you get into the merits of that, let me just ask you about how we review this decision. Under our case law, as I understand it, the jurisdictional aspect of this, we review de novo, right? That's correct. It goes exactly, I think, Judge Tatel, to the could-issue versus should-issue point that I just mentioned. You're right that as a jurisdictional matter, Mandamus is reviewed. Whether you have jurisdiction to grant Mandamus would be reviewed de novo. As Judge Boasberg recognized, though, when you're in this kind of a context, when you're talking about Mandamus to compel the Secretary to act on something that's been unduly delayed, there's a point at which the jurisdiction merges pretty quickly with the merits. But don't we have to separate that here for purposes of our review? To the extent it's equitable, we review for abuse of discretion, right? That's correct. Where do the track factors fit into that? I think the track factors most naturally fit into the second aspect of it. The equity part of it.  It was, yes. So we review this for abuse of discretion? You would review his application of the track factors for abuse of discretion, yes. Does that make sense? I mean, I know we've said that, but doesn't it seem odd that in something as significant as Mandamus in the federal agency, I mean, we have spectacular district judges in this circuit, but they may have all different views about how the equities work out from case to case. There wouldn't be much consistency. True, Judge Tatel, but I think the other unusual aspect of the Mandamus appeal that rarely, if ever, is present in anything else is the point that I started with, which is it may well have been the case in December of 2014 that the district judge's decision might have been within his discretion at that time. He might have seen indicia in the record that gave him some comfort that things were moving in the right direction, which is what he said toward the end of his opinion. The reason in November of 2015 we are coming to you essentially on a different footing is because nothing has changed. But if we're reviewing for abuse of discretion, don't we then, if we think the circumstances have changed, don't we have to send it back to the district judge to rebalance the equities? I think in the end, Judge Tatel, that is what we would ask you to do, but we would ask you to remand essentially with instructions either for Mandamus to issue or for the district court to retain. That doesn't sound like abuse of discretion review to me. Or for the district court to retain jurisdiction and do the type of jurisdictional supervision that we think is necessary in this case. But as for abuse of discretion, here is where things stand. Even Judge Boasberg understood that when you got to the track factors, he declared it to be essentially a very close call. There were factors that clearly counseled in favor of Mandamus issuing. Unlike many of the undue delay cases that this court sees, there actually is a statutory directive attached to this system. What about the district court process, the escalation process to avoid the process of delay? I know the district court didn't rely on that, but that's important to me. He did not rely on it, and I think for good reason. The escalation process that you are referring to, Judge Kavanaugh, essentially allows a hospital, if it chooses to forego one level of administrative review to which it is entitled, to leapfrog into a new line seeking administrative review at that level to which it is entitled. What if it goes all the way to the district court? If it goes all the way to the district court, a couple things. First of all, if you look in the record at Joint Appendix 117, you'll find a declaration from Constance Tobias, who is the chair of the Departmental Appeals Board. One of the things she says is, I have never seen someone escalate a claim all the way up to the district court. Why not? Suppose you lost here. Why not flood the zone of the district court by filing constant appeals in the district court? And why isn't that good enough if the district court is reviewing these very quickly? Because, as we said in our reply brief, as a practical matter, and setting aside, by the way, whether escalation to the district court actually is an adequate remedy for what we're talking about. That's what I'm exploring. Is it an adequate remedy? That's my question. Our position is that we are entitled to a remedy at each stage of the administrative process. Setting that argument aside, as a practical matter, your question about whether we could escalate all the way up to the district court, assuming that a particular claim met the amount in controversy, what you would get, which all of them would if aggregated, once you've got to the district court, the district judge would be presented, in this case, assuming that you've got the backlog you do now, with just under a million claims that have no record attached to them whatsoever. Any district judge, in their right mind, would remand all the way back to the district court. It would be chaos, and Congress would probably react, but I don't see why, in individual cases, that wouldn't be good enough for your clients to go to district court. I don't know what kind of review there would be in district court. It could be de novo review with trial-like procedures. Even if it were de novo review, we have a suggestion in the record already from the departmental appeals board, and we've cited this in our reply brief. This is the Pembroke-Pines case. We have a suggestion in the record already that the board, in that event, and this wasn't even a district court escalation. This was the board reviewing something that had been escalated past the ALJ level, which is where the hearing happens, where the oral testimony is taken, and all of those things are put into the record. The departmental appeals board looked at this case and said, we can't review this on this record. This has to go back to the ALJ. So whether you look at it as a review board. Now, you said that in your brief, but I was trying to explore that. Why is that the case that the district court gets a case, and it's just, in essence, an appeal from the bear, a MAC determination? The district court could just say, okay, present your witnesses, and let's determine whether that's accurate. A district court, perhaps with a nice light docket, might take that approach. But the district court also would be well within its discretion to look at this administrative appeal, which is essentially what it would be, look at the thin file attached to it and say, I cannot review this decision without adequate administrative records to support it. I'm going to remand all the way back to the beginning of the line, and this starts all over again. Can I ask one question about this process, the escalation alternative? It applies to either party? No. My understanding is that it applies to, it permits a hospital to escalate on the hospital's request. There are circumstances where, for example, the departmental appeals board can review that request and either answer the appeal within a specified timeframe or permit it to go forward. But I'm not familiar with the situation, and nor I think has Ms. Tobias suggested in her declaration, that you could have a situation where the agency automatically escalates an appeal. It's really at the hospital's discretion. I mean, the way it's written, it talks about the party. But as it's been understood, the party only refers to? I think as it's been understood, and certainly as it's been put into practice, the party is the aggrieved party, the party seeking reimbursement, which would be the hospital or the provider. But couldn't it have, couldn't it work in such a situation in which the hospital actually prevailed at one stage and then at the next stage it would be a different party, i.e., the agency, that would be the party that was taking the appeal, and then in that situation the agency could escalate? I think in that hypothetical situation the agency could escalate, but I'm certainly not familiar with any case in which that's been present. Well, let's just suppose the agency can. Maybe I take your point as a matter of history. Maybe it's never happened, and maybe we're just imagining things. But if that's true, then it seems to me that at least one plausible interpretation of the statutory regime is that, yes, there are disadvantages to escalating, because you don't get the same procedural opportunities that, as you have pointed out before, you would get the face-to-face hearing, a more robust opportunity to introduce evidence. But that's just reality. And whichever party is aggrieved, if it gets past the statutory deadline, you have an opportunity to take it up. Circumstances be what they may. If not, you've got to sit tight. And that's just the way the statute works. Judge Srinivasan, when Congress put these deadlines into effect in 2000, I cannot imagine that Congress thought that it would resolve the problem that was presented then, which was ALJ appeals with no timeline that were not being resolved within even a year or a year and a half, that Congress thought that it could resolve that problem by putting in place a problem that would essentially put these hospitals into an endless loop only on the condition that they could get out of the loop if they forego all of their administrative appeal rights and go all the way up to the district court. I take your point as a practical matter, but there would be at least some cases where escalation bore fruit in the sense that it warranted an earlier decision because the record was clear. So it wouldn't be an empty exercise. There would be some advantage. You're right that there's going to be situations in which the absence of a robust record is going to be problematic down the line, and so we may end up exactly back where we were before. But at least it will have some possibility of advancement. I think that possibility, Judge Srinivasan, is infinitesimal, when what we're talking about is escalating a case past two levels of review. But the real sticking point here in the process is the ALJ level, which is that third level of administrative review. That's the level that's supposed to take place from stem to stern in 90 days, and it takes right now upwards of about 780. If you skip that ALJ level review and you skip the departmental appeals board level and you go all the way up to the district court, the district court is looking at a record that doesn't have any of the indicia of an administrative record attached to it, precisely for the reason that you pointed out, which is that the hospital has now been forced to forego all of those other administrative protections that Congress gave it in order just to jump the line and go to the district court and almost inevitably to be sent back. There is no rational reason why district judges would accept 800,000 or more appeals that have been escalated from an early administrative level up to a federal trial court. They might have a choice. What do you mean they don't have to accept? They might not have a choice. They would complain to Congress, no doubt, as judges do, and there would be presumably some fix to this, either more funding or end the deadlines or cut back on the RAC process. Those are three obvious options for Congress. True, Judge Kavanaugh, that if we were presented with a situation where hospitals flooded district judges with hundreds of thousands of claims, presumably there would be complaints to Congress, but the fact that that could happen and that there might be a complaint to Congress, that there might be an additional fix to this that they could supply, doesn't answer the main damus question here, which is, is there a right? Is there an entitlement? Is there an adequate remedy? We say no, precisely for the reason we're talking about. So let me switch off the escalation process for me, at least for a second. Play out the main damus. Suppose we agree with you here and order main damus to issue, and then they still don't comply. Yes, so this is. So play out, because you say in the brief, I think, or face the consequences. What are those consequences? Yes, that's the or else problem with the main damus, and I do think this is a significant dispute between the parties, is what does that or else look like? It's obvious to everybody that the secretary is violating her statutory deadlines. It's equally obvious that she can't snap into compliance tomorrow. So what we would suggest, in order to put any teeth into a main damus order, is that the district court grant main damus require the secretary essentially to take all reasonable steps to come into compliance and ask the secretary to file status reports every 30 days, showing some progress. If, in the end, and this is the consequences, if, in the end, the secretary proves unwilling or unable to make serious inroads into these backlogs, I think one option for the district judge would be to declare all of the pending agency appeals resolved in the hospital's favor. I understand that sounds radical, but we are in a situation where when main damus has been sought before, for example, by the PMOI, a former terrorist group in Iran, main damus was sought in that case against the secretary because the secretary of state had declined to decide one way or another. How often do the hospitals win on these appeals? For the hospitals that have essentially the highest dollar value, highest volume claims, which are the claims that the recovery audit contractors, the RACs, tend to focus on, the estimates of a hospital prevailing on appeal range from about 66 percent to 85 percent. But the government says it's 7 to 9 percent. As I understood the briefing, there's competition on this. Your brief says, based on some self-reporting, I think, that the rate is somewhere north of 66 percent. I thought that there's just a direct conflict because the government says, actually based on its information, it's 7 to 9 percent. No, I think, Judge Srinivasan, there's some selective slicing of data going on. I think that the government is aggregating every single claim from every possible provider and beneficiary at a certain stage. As opposed to just the RAC cases? As opposed to just the RAC cases. We are focused here on the highest dollar claims, the claims that are essentially doing the most harm to hospitals because that is essentially a significant part of the bucket of claims we're waiting for. The RAC claims alone, we say in our briefing, are about $1.8 billion. So what the government says in its brief at page 9, and we can obviously ask the government this, but just get your characterization of it. In 2012, only 7 percent of claims identified by audit contractors as overpayments were challenged and overturned on appeals. When it says claims identified by audit contractors as overpayments, I take that to be RAC cases, but is that not right? That is the 2012 number, I think, for all claims. And what we're talking about are, again, the high dollar, high value claims. Why is it all claims if it says claims identified by audit contractors as overpayments? All RAC claims, yes. So then if that's RAC claims, then isn't there a direct, you say 66 percent and they say 7 percent? No, there's not. When we're talking about claims that are overturned at a very high clip, we're focusing in particular, again, on a certain high dollar, high volume claims, mostly having to do with inpatient versus outpatient. So you're focusing on a subset of RAC claims? And rehabilitation cases, yes. And that subset is $1.8 billion. Right, but it's a subset in terms of numbers. So if we look at all RAC claims, then you don't dispute the point that it's 7 to 9 percent. If we look at the subset that are high dollar claims that you're looking at, you'd say that it's much, much higher. I would want to understand to make sure before I guarantee to you that the audit, you know, contractor and the RAC subsets or sets are the same before we start breaking them into subsets. Okay. My point is our subset, the subset with which we are most concerned, is $1.8 billion. Their larger argument is that they can't do this because they don't have the resources. Right. So two things. I understand my time is up, but I hope you won't judge me. No, you keep going. But I first want to tie up the knot, if I could, on the remedy question, Judge Kavanaugh, before I answer that. As for remedy, I mentioned that in the end, if the Secretary didn't show significant progress in a period of time, one of the options the district judge might have available to him is to direct that all of the pending appeals are resolved in the hospital's favor. I said I understood that sounded radical. The PMOI case that I mentioned is a situation where when Mandamus was presented to this court, petition from Mandamus was presented to this court, this court directed the Secretary to either make a decision delisting the organization  or this court would delist the organization. That was the or else in that case. So it is possible that the consequence could be significant for the Secretary, but it exists. So that's the consequences part. The remedy part is this. The Secretary, I think, understandably, takes a very narrow focus on resources applicable to the Office of Medicare Hearings and Appeals, that ALJ level entity. And what she says is we only get X million dollars per year, and that's not enough for us to do our job. The first, there are two responses, I think. The first is they get tens of millions of dollars a year to do this job. Congress has instructed them to resolve ALJ appeals in 90 days, and it's given them tens of millions of dollars to do it. We'd all like more money to do our jobs, but I don't think it is an only answer to say we would like to throw more money at this problem. There are conceivably, and the government has actually articulated some of these, ways to address this problem short of throwing tens of millions more dollars at this. For example, you'll see in the briefing and in the joint appendix, there are references by Judge Griswold, who's the chief ALJ, to things like ADR, things like mass settlements, which actually are already occurring, things like statistical sampling of hospital claims in order to resolve claims essentially by volume rather than individually. Or cutting back on the RAC process. That's something that's in your brief, I think. In fact, that's the focus of your brief. That would be a result devoutly to be wished. But even if that happened, even if the district court ordered mandamus, and the department responded by, it can't eliminate the RAC program, right? That's required by statute. Suppose it just cut it way back. Would it? They still couldn't comply with the resources they have, could they? Well, I think there are a couple different ways to look at it, Judge Tatel. You're right that even if right now the secretary pared back the RAC program, you're quite correct, she couldn't eliminate it altogether. But even if she pared it back or changed the contingencies on which they operate or changed some of the other sort of indicia of the program, that might stop the incoming claims into the pipeline. But you still, you're right, would have the problem about the pending claims. And paring back the RACs might be a solution but not the only solution. What it would do, I would tell you, is some combination of these things, including paring back the RACs, including, for example, changing the regulations. And the secretary can do this. Changing the regulations to state that a final determination, which is when interest starts running on a claim, a final determination doesn't issue essentially until the final level of appeal is pursued and satisfied. That would alleviate the harm to the hospitals. And the hospitals, to be very clear, we're not here complaining of a bare statutory violation without any concrete injury attached to it. We are complaining because there is the aforementioned $1.8 billion tied to the last process. Is there anything short of mandamus, the district record issue, that would help here? I mean, suppose, for example, the district court order, you mentioned quarterly reports. Suppose the court were to order, say, look, we're not there yet, but we want quarterly reports. Would that help? I think it would help if the quarterly reports had a little bit of, if the order requiring reports had a little bit of bite to it. And the examples I would use, there are two. There are situations where this court, using its original jurisdiction over an appeal that came, or a petition that came straight to it, says we're going to retain jurisdiction. We're going to require reports every 60 days. And if at the end of X period of time we don't see progress or a resolution, there will be consequences, and those consequences could be the ones that I was discussing earlier. That is completely within the purview of the district judge, and I think something that is quite fairly sought on this current record, because things, again, are not getting better. They're getting worse. The order that I would not want to see is one that just says, check in with us every quarter. We have seen examples of those. There's a case that still, I think, is pending in this court that was argued in 1998. It was an FAA case where an undue delay challenge was brought. This court denied the challenge but said check in with us every quarter, and every quarter since 1999 the FAA has been filing reports. That is not a result we would want to see. We would want an order with consequences attached to it. But on mandamus, for the specific relief that you seek, because I take it one prong of mandamus is that you have a clear entitlement to the relief you seek. The specific relief you seek is an order that says that the appeals have to be completed by the statutory time frame. And then all the other things we've been talking about is ways that the agency could attempt to abide by that directive. But the directive that you seek is an order based on a petition of mandamus that just says, I don't know how you're going to do it, just do it. Yes. That is where there's the legal question and then there's the question of practicalities. The legal question is you shall come into compliance with your statutory deadlines. No more suggesting that these are just generally applicable or these are just aspirational. They are deadlines and you are to comply with them. The practicalities are where the secretary actually has a lot of latitude. And money or no money, she can find creative ways to deal with the problem. In terms of your answers to Judge Kavanaugh's question, if the court were to decide that escalation to the district court is an adequate remedy, then there's no jurisdiction, correct? If the court were to decide, yes. There's no jurisdiction. We don't even get to the direct act. It's the end of the case. If the court were to decide that the double or triple escalation we're talking about is an adequate remedy, then you would not find that main damage factor satisfied and there wouldn't be jurisdiction. Judge Boasberg, of course, as I think Judge Kavanaugh mentioned, didn't go that far. He found jurisdiction. He granted the motion to dismiss but denied the summary judgment motion. You agree with that? We reviewed no. Yes, I would agree with that. If there are no further questions. Okay. Thank you. May it please the Court, Joshua Salzman on behalf of Secretary Burwell. I'd like to just dive right in on the escalation issue first, and then we can talk about the equitable and the track factors. And there's one sort of pervasive misunderstanding with regards to escalation, I think. I just want to make sure it gets cleared up at the outset. And that's this notion that the important record building happens at the ALJ stage. So would it be de novo review in the district court with trial-like procedures? No, I don't think it would be. Okay. Then you're losing something. So what you just said is not right then. Well, I just want to correct the impression that the record is being built at the third level. If you look at 42 U.S.C. section 1395 FF subpart B3, what it says is that the provider is supposed to introduce their evidence at the second level review before the qualified independent contractor. And, in fact, they can't introduce any evidence later on in the process unless there's good cause, which precluded the introduction of such evidence at or before that reconsideration. Okay. So they've put in all the documentary evidence to the QIC, right? And then they escalate from there to the district court. And what happens, in your view, in the district court? And then if you could explain what you think happens, how that differs from what Ms. Stetson thinks would happen in the district court. Sure. So I think the fundamental disagreement I have with Ms. Stetson is about whether the record that would exist when it went up to the district court would be adequate to resolve the claim, because I think that record is supposed to be built at the second level of review. What I think would then happen before the district court is something I think similar to an APA case where you have a record with review. Now, district courts retain procedures to allow supplementation of the record as need be. I mean, there are procedures in place. What standard of review? At that point, I think it would be subject to the standard that always applies when district court challenges are being heard from the agency final decision. Deferential standard of review as opposed to the ALJ, which would be de novo review of the determination. I think that's right, Your Honor. Right, and that's what you're losing. Yeah, I would agree. But I would say that... And that's significant. The standard of review can make all the difference in a lot of these cases. Principal, I hope this court will very much remember in this case where they have, you know, the mandamus burden to meet. But, yes, absolutely. I acknowledge that there is a difference in the standard of review. Excuse me. On the question you're talking about now with Judge Kavanaugh, our review is de novo, right? Right. Okay. No, that's certainly true. Okay. But their burden... The review is de novo, but they still need to make the extraordinary showing. You are reviewing de novo... All we have to do is look at the statute and see whether we think they're... I mean, all we have to do is read the statute. Well, I think you have to read the 90 days shall provision. The statute says there shall be a decision in 90 days, but Congress also prescribed a remedy. Congress said the consequence is... Yes, I agree, but that's part of reading the statute. Oh, absolutely. The question is, and this is one we reviewed de novo, is does the... Do the possibility of the provision for escalation mean that these deadlines are not deadlines, right? In other words, there is no duty. That's your argument, but that's a de novo question, and all we have to do is read the statute. Either you're right or they're right. I'm not sure what the burden is here. Oh, no, I agree with that, Your Honor. All right. Well, go ahead. Yeah, and I think here the question, if you are looking at this statute where Congress laid out the consequence, which is the agency loses the protection of exhaustion requirements, they get the opportunity to jump forward up to the next level of review without waiting for a decision, and I think that the best reading of the statute here is that Congress did not intend to confer a right that would be enforceable through mandamus. Obviously, that's their preferred path of review, but I don't think that's the path that Congress prescribed. What do you do with the fact that, I hear what you're saying, but, you know, their mandamus petition here is couched in terms, the only thing they want is compliance with the statutory deadlines. That's it. That's what they seek in the very first sentence of their complaint. They want, they bring this mandamus complaint to compel the secretary to meet the statutory deadlines. That's all they want. And escalation does not accomplish that. Escalation does not accomplish that. Right. But to the extent that they're relying on a few individual providers here up in it, on Rutledge, and I don't think that they've shown these individual companies that they're claiming are, you know, on the brink. Well, now you're into the equities. Now you're beyond this question of whether or not there's a duty, a clear duty. That's a statutory question. Well, there's three subparts, right? There's the duty, there's the right, there's the duty, and there's the adequate remedy. You say this is a remedy. I think this is pertinent to all three prongs of mandamus. And, in fact, a district court. How is it a remedy to the association's goal of obtaining a decision within 90 days? You're saying the association now, not the individual plaintiffs who are here. Because if you have a plaintiff who only has 95 claims, I don't think that they've adequately shown why a provider with just 95 claims that is pending at the ALJ level can't seek escalation and why that won't provide an adequate remedy here. The district courts won't be able to handle this in any kind of quick way, will they? So district courts, I'm not going to tell you escalation is a panacea for the backlog itself. That if all 800,000 appeals were escalated, that that would solve this problem. It would be a disaster, right? So why would we rely on that fantasy as an adequate remedy for the violation? Because I think that the system has been set up here. Congress picked a path for review. That's the, oh, picked a remedy. The consequence Congress chose was escalation. If providers are in desperate economic straits, as they allege they are, those subset of providers can escalate. But don't you think Congress, I'm sorry to interrupt, don't you think Congress most likely was operating under an assumption that that would be the unusual case where escalation would be needed, not an 800,000 claims flooding the district court? No doubt, Your Honor. And certainly I think everyone was overwhelmed by the fact that there was a 12-fold increase in the number of appeals that were reaching the third level of review. Over a five-year period, you saw a 1,222% increase in these. I agree that the system didn't necessarily envision that in advance, but that doesn't change the fact that the consequence Congress prescribed was escalation. So if we just go to mandamus now without escalation, it seems to me that your brief privileges or favors the discretionary programs over the mandatory deadlines. And I don't see how you can do that consistent with our system of separation of powers. You have to follow congressional mandates. Absolutely, Your Honor. But those congressional mandates, as this court recognized in Aiken County, are subject to funding Congress's own funding decisions. The same Congress that set the 90-day deadline also saw fit to fund 87 ALJ teams. That's enough to adjudicate about 87,000 claims a year, now that the agency has managed to double the efficiency of its ALJ teams. But if you adjusted the funding for other programs or adjusted the RAC process, as the brief for plaintiffs suggests, that would allow you to meet the deadlines, or to come closer to meeting the deadlines is probably more accurate. I don't think that's actually true, Your Honor, because OMHA, the third level of review, the Office of Medicare Hearings and Appeals, is an agency that's funded through a line-item appropriation. That line-item appropriation is about $87 million. But if there were fewer appeals, I guess is the point they're making. In other words, the RAC process triggered the huge number of appeals. The office can't handle the huge number of appeals, but the RAC process is not mandatory, at least to this extent. And therefore, because it's discretionary to have it to this extent, you should cut back on it to comply with the statutory mandates. I think that's their theory, that statutory mandates trump discretionary decisions of the agency to effectuate its policy goals. Just a few things about the RAC program. First, as Your Honor recognizes, while some of the implementation details are at the Secretary's discretion, the program itself is a statutory mandate to deter waste, fraud, and abuse, and it's returned billions of taxpayer dollars to the Medicare Trust Fund. The second thing I'd say about the RAC program is the RAC program is not the only reason that this backlog exists. The agency tells me 46% of the pending appeals before OMHA are RAC cases. But between 2009 and 2014, as Judge Griswold told the Senate, there was a 543% increase in the traditional workload. That's the non-RAC workload. So if we're looking at the statute holistically, then I guess one question would be, what would Congress have preferred, adherence to the deadlines or curtailing of the RAC process? I get that you moved on to non-RAC appeals, but just on the RAC part of it for a second. Adherence to the deadlines or curtailing of the RAC program. Now, for me, to me, then it starts to matter what fruit is the RAC program bearing. And in order to understand that, you have to understand to what extent do RAC appeals succeed and do they not succeed. So on that question, for you to curtail the RAC program, is it true that you'd be curtailing a program in which you're saving billions of dollars, which Congress apparently wanted to have happen, and you're winning 90% to 95% of the appeals? We are not winning 90% to 95% of the appeals. But keep in mind, the provider isn't necessarily appeal. The 7% to 9% figure that Your Honor quoted during Ms. Stetson's argument, that is all RAC claims, many of which are not appeal, many of which the provider says either recognizes they were wrong or decides not to seek an appeal. That's money saved for the taxpayer. That's not going to show up in the reversal. That only makes the percentage even lower. That's something that cuts in your favor, it sounds like. Yes, it does. But in terms of what Congress is interested in, in terms of saving taxpayer money,  But their point is that if you look at actually the significant cases, you're lumping together all RAC cases, including ones that are worth pennies on the dollar. But if you just look at significant cases, there's actually a high rate of overturning. Right. So they've alleged a 66% reversal rate. I don't have numbers, I don't think the agency has numbers that are broken out that perfectly would map on to what they have. I can tell you at the third level of review overall, and this is both RAC and non-RAC, the overall rate at which providers prevailed was 43%. So now they have asked their members for a particular subset of claims. I don't know exactly how that data is derived. But from the agency's perspective and from the government's perspective, what's important is trying to make sure that this program that Congress mandated the agency to implement in order to deter waste, fraud, and abuse has successfully returned many billions of dollars. But the problem is that the degree to which that program is pursued by HHS is within HHS's discretion. Congress hasn't mandated any particular level of enforcement. By contrast, on the deadlines, Congress has given no flexibility. And usually statutory mandates and prohibitions and deadlines trump discretionary agency decisions about how far to go to achieve some objective. That's my concern here, is that you've got a mandate on the one hand and you've got discretion of the agency on the other, and the agencies don't usually get to choose their discretion over a statutory mandate. I don't think there was any choice by the agency to forego the 90-day deadline. There was a mandate that came down from Congress. There had been a demonstration project that tried out the racks in three states. Congress was sufficiently impressed with it that it said by 2010 it instructed that the agency should implement this nationwide. The agency then proceeded to do that. The agency didn't do it with an expectation or with making a conscious policy tradeoff to say, well, even if this means we're going to start missing the 90-day deadline, it's worth it. But now that it knows there's been no recognition or acknowledgment or decision to say, how can we meet this statutory mandate? And you may think the mandate for the 90 days is not that big a deal, and I'm not attributing that to you. But Congress put it in there as an absolute, so we have to comply with that. I mean, one of the most important things any executive branch lawyer has to do is say, the first thing we have to do is comply with all the statutory mandates. And after that, and prohibitions, after that we can figure out how to exercise their discretion. I don't see anything in your brief that acknowledges that executive branch reality. Well, I think the executive branch has taken this 90-day deadline quite seriously, Your Honor. It implemented staffing changes that doubled the efficiency of the ALJs. It met the deadline consistently from 2005 to 2010. Then it doubled the efficiency of its ALJs. It instituted pilot programs with statistical sampling and an alternative dispute resolution in an effort to address this. And perhaps most significantly, and what matters most, I think, for any hope of addressing this, is it went to Congress and the agency has asked for the resources it needs to tackle this problem. And according to the reply brief, those resources are going to be forthcoming. In the reply brief it says that the House would continue the funding at the 2015 level, and the Senate would increase it by only $10 million. So that's not going to make any difference. I'm sorry, Your Honor. That was a question, sorry. Will that make any difference? The $10 million would not make a difference. But in addition, there's separate legislation coming out of the Senate Finance Committee. This is the so-called Affirm Act. It's a bipartisan legislation. It was reported out of committee. Media reports have suggested it's going to be introduced to the full Senate quite soon, potentially before Thanksgiving. And that legislation would add $125 million in new funding, plus provide several new authorities to the agency to do things like resolve cases in ways that would be more expeditious. So suppose that doesn't happen, an unlikely event given Congress these days. Suppose it doesn't pass that. And we deny, we affirm the district court, and they come back next year, and the act hasn't passed, and there hasn't been a significant increase in appropriations, and the backlog has grown. Would we then grant mandamus? I don't think so, Your Honor. Are there any circumstances under which you could see the court granting mandamus in a case like this? Not so long as the agency is working with the resources it has been given to Congress to try to resolve this problem. I think our labs and Mashpee Wampanoag are quite clear that when a problem stems from a shortage of resources, and that describes this case perfectly, it's a problem for the political branches to resolve. No, those two cases were about privileging one mandate over another. They're not this case. They distinguished the privileging generic manufacturers as a whole from privileging individual ones. It's right there in the language of our labs. That seems quite different from this case. Here you have a situation where the agency has been given completely inadequate resources to meet its current workload. There's been no suggestion that the agency is not using the money that it was given for that purpose. That was Aiken County, for example. The agency was given the money but was choosing not to spend it. Here the agency is spending that money. It is diligently trying to resolve these appeals. It has just simply been overwhelmed by a 12-fold increase in its workload while its budget remained relatively constant. And in the face of that, I'm not quite sure how mandamus can provide a solution here. Even mandamus, if the agency only has sufficient staffing, as provided in a line-item appropriation from Congress, in order to resolve about 80,000 appeals a year, even a mandamus order can't allow the Secretary to make 80,000. I think the premise of your position, and I understand this premise, is that we can't tinker with the RAC process. We can only focus on the staffing and funding for the decision-making process. Is that an accurate understanding of what you're saying? I think that under the mandamus statute, they're supposed to identify a ministerial act that has been withheld and compel compliance with that. And that's comply with the deadlines. And the question then is, what can you do to comply with the deadlines? You're saying it's impossible or near impossible. And on that, you're saying lack of staffing, lack of funding. But they're saying, well, you could also tinker with the RAC process in order to comply with the deadlines. Is that something you're disagreeing with? So obviously, the Secretary has some discretion to change how the RAC program operates. I don't think, first of all, I think it's important to keep in mind that while that would affect sort of the pipeline of cases feeding further into the backlog, to the extent that their mandamus petition is predicated on the idea that they have already been pending for 90 days and they want a hearing on those claims, while stopping or changing the inflow into the system doesn't get those cases further. But how about for the future cases? And you answered a different question. But on the future cases, is tinkering with the RAC process an appropriate or not an appropriate part of how you could comply with this mandate? I don't think so, Your Honor. And again, I understand you think it's distinguishable. But in Bar Labs, the argument was made that the agency was being inefficient. And the Court said that very well may be. But the Court has neither the capacity nor the authority to implement the sorts of changes that the petitioner, in that case, was seeking to have the agency make. I mean, it was Bar Labs. What the Court said, and I won't belabor this, but the Court said while Congress clearly intended a faster track for generic drug applications in general, so underscore that, it did not choose a super priority for Bar. So it was Bar versus other generic applicants. But the Court did say Congress clearly intended a faster track for generic drug applications in general. And then if you look at cases like Norton on 65 and 71, the Supreme Court specifically talks about statutory deadlines as being the exact kind of thing that is appropriate for this kind of compelled agency action by a court, as distinguished from the situation going on in Norton. Sure. Though Norton also says that the limits on mandamus are to protect agencies from undue interference with their lawful discretion, but also to avoid judicial entanglement in abstract policy disagreements, which courts lack both the expertise and the information to resolve. So I think if you end up in a situation where some changes are made to the RAC program, nobody seriously contends that suddenly the agency is meeting that deadline. It puts the Court in a position of trying to judge how much is enough, what's the right balance. On that meeting the deadline, this is an important point for me. Is it all or nothing? In other words, if adjustments to the RAC program would really help but not get you all the way to the 90 days, is that not to be considered at all? In other words, do you have to get all the way to the 90 days for it to be relevant? Do you understand the question? I do understand the question, Your Honor. My problem with the question is it proceeds from the assumption that there would sort of be a useful way for the Court to be able to evaluate whether the right balance had been struck in reforming the RAC program. And I just don't think there's enough legal clarity here to sort of buy a judicial intervention. Ryan, I'm sorry, did you have a follow-up? Go ahead. Let me just pursue that with you a minute. Okay, so looking at the record here, I don't have any doubt from the briefs that the Secretary has done and is doing everything she can to comply with these deadlines. Let's assume that that's true because there's nothing in the record that suggests that's not. Your argument is, look, you can't – if we force the deadlines, you'll have to cut the RAC program and Congress wants the RAC program. Wouldn't it help the Secretary in terms of her effort to get more resources to have a little pressure from the courts? I mean, short of granting mandamus, for example, suppose the District Court were to order the Department to tell Congress in no uncertain terms that it's facing a choice with the resources it's got. It either complies with the deadlines or it continues the RAC program. It can't do both. And then we'll know for sure whether Congress has made that choice, won't we? Wouldn't that help the Secretary? I don't think the Secretary would be helped here by having a mandamus order. I didn't say a mandamus order. I said short of mandamus, something that directed the Secretary to make clear so Congress completely understands that if it doesn't provide the funds that are in this statute, that the court might cut back, might order the Secretary to comply, and the only – and the result of that would be substantial cuts in the RAC program in the effort to recover fraud, waste, and abuse. I mean, then we'd know what Congress really thinks, right? Perhaps, Your Honor, but Congress is already well aware. Both houses of Congress have held hearings with exactly these policy questions before them. It's nothing like a hanging to bring people's attention. I mean, would Congress – I mean, I've been in that position. I can tell you if I were the Secretary, a court order like that would be enormously helpful in terms of getting the resources out of Congress or at least resolving the issue. I'm not sure from their perspective. Because as you've conceded in your answers to Judge Kavanaugh's question, the level of the RAC program is totally discretionary. This would tell us whether Congress – how much Congress cares about that program. They'll either fund, give you enough money to process to meet the deadlines, or they won't. But they'll know the consequences of it. Perhaps there could be changes to the RAC program, but I also do want to refocus back on the fact that there's this existing 800,000 case backlog, and even eliminating the RAC program tomorrow I don't think would satisfy the plaintiffs here insofar as the basis of their purported entitlement to relief is the existence of their pending claims. And those claims are not going to be decided any faster even in the RAC program. But Congress – I mean, Aiken County, we went through a multi-step process. We did not grant mandamus the first time it came up. There was kind of a last clear chance decision by the court. And here, as Judge Tatel says, if we did something similar, then you would know Congress could either do more funding, they could eliminate the deadlines, or they could let the RAC program be scaled back. They would have to do something like that or know that a court mandamus was going to follow at some point in the near future, similar to Aiken County in that respect. This court has discretion to retain jurisdiction. The court has – did take, as you say, that path in Aiken County. But in Aiken County, I really think it was quite different because there the agency had the money. It had been appropriated, and the agency was making a policy choice not to follow a statutory directive. That's not this case at all. This is a case where the agency simply has not been given the financial resources and to some extent the legal authorities it needs to resolve this issue. It has asked Congress for those resources. Okay, thank you. Thank you, Your Honor. Let's see. Ms. Stetson, we used up – or you used up – or we both used up all your time. So you can take two minutes. Thank you, Your Honor. Just a couple quick points. The first is I don't think that the right way to view this is as a balance between complying with a statutory deadline and carrying out a statutory program to its fullest extent. The deadline wins every time. And in the five years since this backlog has been growing and growing, Congress has had multiple opportunities to change the deadline if it wanted to, and it has not. So we can take from that. We don't need to define Congress's intent about the forcefulness with which it wanted the RAC program administered. We know from the maintenance of the deadlines that Congress wanted the deadlines maintained. I also don't think it's an answer to view this problem as being susceptible only to a singular solution, settle everything, fix the RACs, and the entire problem will go away. This, I think, is a situation where if the Secretary is compelled to come into compliance with the deadlines, she can do a number of things. She can tinker with the RACs, as you say. She can settle some more cases. She can put some more cases into ADR. She might be able to hire some more ALJs. She might be able to train them to do their jobs even more quickly and more uniformly, which is something that she's been working on as well. All of those fixes, not in the singular but in the plural, would go towards solving this plain statutory violation. So if this Court, as it's suggesting, declines to grant mandamus now, we would urge it to put in place some kind of an order requiring status reports. And yes, Judge Tatel, I do think that when there is a court order, Congress listens. If they do all of that but can't quite still meet the deadlines but can do a lot better, how do we analyze that in this context? I think if we were to come in in six months and the statutory deadlines were still being violated but only by a matter of days or a few weeks, then I think the calculus changes in two respects. First, the harm to the hospitals obviously is significantly ameliorated. And second, when you look at a mandamus action that arises from an undue delay case, you ask whether the delay is egregious. The delay here we think plainly is egregious, 90 days versus 700 some odd days. If we are in a situation where it's 90 days versus 110, there's a violation, but it may not be egregious enough for a mandamus to issue. But at least then we would know that the secretary is doing everything that she is capable of and creatively thinking of to resolve the problem. One other question I want to make sure I understand the factual details of. How does the interest work if you prevail somewhere down the road in the administrative process? So the interest works in this way. The interest begins running at essentially the midpoint in the appeals process, if I remember correctly. And that goes both ways. It goes both for the hospital, if the hospital ends up losing, and for the government. The problem is with these hospitals, many of which are nonprofit, it is not a financially rational choice for them to essentially hold back the money or decline to have it recouped in the hopes and the risk that they might ultimately prevail. So the hospital is going to pay the money to the government early every time. Okay, thank you. Thank you, Your Honor. The case is submitted.
judges: Tatel, Kavanaugh, Srinivasan